In 1772 the same land (by mesne conveyance) vested in Neill McArthur in fee simple.
In 1775 the said Neill McArthur took up arms against this State and joined the public enemies thereof.
In 1776, being in arms, and adhering to the enemies of this State, he was taken prisoner, and carried to Fredericktown, in Maryland, where he was confined as a prisoner of war.
In April, 1777, he solicited permission from the Congress of the United States to come to this State for the purpose (as he professed) of taking the oath of allegiance to this State. Congress granted him permission, on his giving security that he would return to Fredericktown in three months, unless on his coming to this State he (553) *Page 402 
took the oath of allegiance to this State. John McKay, the witness who testified to these facts, became security for his return according to his parol.
Under these circumstances the said Neill McArthur came into Cumberland County, where he had formerly resided, and on 4 July, 1777, he conveyed the land in question to his son, Archibald McArthur, an infant, in consideration of natural love and affection and of five shillings.
In July, 1777, the said Neill McArthur returned, according to his parol, to Fredericktown, as a prisoner of war, without having taken the oath of allegiance to this State, and having refused to take the same while here.
In July, Term, 1782, of Cumberland County Court the executors of Robert Hogg, obtaining judgment against the said Neill McArthur under and by virtue of an act of the General Assembly passed in 1782, ch. 6, sec. 19, execution issued thereupon, which was levied on the land in question; and the same being sold by the authority of such judgment and execution, became vested by such mesne conveyances in the aforesaid Farquahar Campbell. Neill McArthur, herein mentioned, is the same person described by that name in the acts of the General Assembly passed in the several sessions of 1779, ch. 2, and in 1782, ch. 6.
The questions submitted to the consideration of the Supreme Court for their decision are:
1. Whether the aforesaid acts of 1779, ch. 2, and of 1782, ch. 6, did absolutely confiscate the real estate of the said Neil McArthur, so that the forfeiture took effect from 4 July, 1776.
2. Whether the said Neill McArthur, having taken up arms and joined the public enemies of this State and of the United States, and being a prisoner of war at the time of the deed of 4 July, 1777, to his son, Archibald McArthur, could make a valid conveyance in law of the lands in question to his said son, by virtue of section 6, ch. 3, of (554) acts of first session of 1777, or by any other authority in law.
Should the opinion of the Supreme Court be in favor of the plaintiffs on both or either of these questions, then judgment to be entered for the plaintiffs. Should the Court be of opinion for the defendant on both questions, then a new trial to be granted.
The case finds that Neill McArthur, in 1775, was taken prisoner of war by the American people, then in resistance to British authority, and that in July, 1777, he being then a prisoner, was permitted to return, upon security, from Maryland to this State for the purpose of taking the oath of allegiance, or, in case of refusal, to return back to *Page 403 
confinement; that upon his return to this State he declined taking the oath, and on 4 July, 1777, conveyed the lands in question to his son, in consideration of natural love and affection and five shillings, and returned back to captivity according to his engagement; that he is mentioned by name in the acts of confiscation; that after 1782, in Cumberland County, a judgment was rendered against him, upon a petition in conformity to the act of Assembly respecting claims against persons who had forfeited their estates, upon which execution issued, and the land in question sold to plaintiff's ancestor. And the question presented for this Court to determine, in substance, is whether the acts of confiscation, passed in 1777, 1779, and 1782, for they contain the substance of all the acts, have the effect, under the circumstances of this case, to render inefficient the conveyance to the son. And this leads to an examination of the acts of 1777, extending the right of disposition to such as were in the country who should refuse to take the oath of allegiance.
It may, however, not be amiss first to strip this case of a feature which was ascribed to it in the argument, namely, that Neill McArthur, by joining the enemies (as they were called) of the country, committed treason, and that the conviction (as the acts of confiscation have been called) relates back to the time of the offense, and will avoid (555) all intermediate conveyances. Now, the first act upon the subject of treason, passed in April, 1777, previously to defining the offense, expressly exempts prisoners of war from allegiance; so that the right which the sovereignty of the country possessed to confiscate must, if it be admitted to exist, depend upon a broader basis than the peculiar conduct of the party to be affected. This right did exist, and depended upon the great principle of necessity — that the sovereign power of the State may act as it pleases with the effects of its enemies; not on account of traitorous conduct in adhering to their lawful sovereign, and fighting his battles, but upon the principle that each of the contending parties may rightfully do all in his power to weaken his adversary, which is supposed to be effected by stripping his subjects of their property, and rendering them less able to contribute to the support of their sovereign's government. The acts of confiscation are not to be considered as a conviction by the grand inquest of the nation, as an act of attainder might be, but as the exercise of a mighty power by the sovereignty of the country to weaken an opposing adversary.
If we, therefore, attend to this radical distinction, we shall evidently perceive the impossibility of the acts having any retrospective operation that is not confined to the property of the enemy. If an estate has been conveyed from one enemy to another enemy, it would still remain within *Page 404 
the control of this power; but whenever it has passed to the hands of those who belong to the sovereign, the property then has the guarantee of the Constitution.
Let it then first be asked, what law, either in the statutes or common law of North Carolina, or in the law of nations, prohibited those who, before 4 July, 1776, had good title and could convey, from conveying afterwards, although they did refuse to become members of the new government? No such statute was passed, nor is it believed to be found in any principle of the common law. But from the cases cited from Vattel it would seem as if this does exist by the great laws of nature, supposed to be understood and adopted by every formation of civil society at (556) its commencement — that whenever a new kind of government shall be adopted, those who acquire property upon the faith of the old one may dispose thereof, and remove their persons. If this condition were not the case of every inhabitant of the State, upon the change of government, from the principles last stated, let us see whether they have not, in effect, been recognized by the acts of Assembly; and this brings us to the examination of the several acts we before proposed.
The act of April, 1777, contains a clause that persons of a particular description, namely, officers of the late king, merchants and factors who had traded with Great Britain or Ireland, within ten years, should becompelled to take the oath of allegiance (this was not required of Neill McArthur, for he was a prisoner of war); they were to be cited for that purpose, and, on refusal, were to depart, and in case of departure, might lawfully sell. Now, what was the object and policy of this law? To favor one particular description of men? Surely not. What, then? Why, these sort of men, most of them Scotchmen who had smarted for rebellion, weresuspected, and the country thought it was interested in getting them away, lest they might instill principles of loyalty to the king. The design, therefore, of the clause, and, indeed, great part of the act, was to bring this matter to the test, and to get rid of such persons, without its ever being thought of as a provision to enable them to sell. And, indeed, upon looking at the fact, it would seem that this was put in through caution, lest the refusal to take the oath might disqualify them from selling. Let it be remembered, McArthur, being a prisoner of war, was not held to allegiance or required to swear.
The act of November, 1777, next is passed; in the first part of which all the act of April is reenacted, and the act then proceeds to direct that everybody should take the oath of allegiance, or depart, except permitted by the county courts to remain. Those who remain, after refusing to take the oath, are restrained from conveying their property for a greater period than one year, and are declared to forfeit all, in case they *Page 405 
remove without permission. They were, therefore, recognized (557) as persons capable of holding lands, and are not considered as affected by the change of government in any other manner than should be prescribed by law.
The act of 1779 is then passed, confiscating the estates of those who, on 4 July, 1776, were absent from the United States, or who since that time withdrew themselves, extending the operation back to 4 July, 1776. And it is remarkable that in section 14 of the act it represents that many persons who had refused to take the oath of allegiance were compelled to leave the State in consequence of the acts of April and November, 1777, and had omitted to sell their lands and appoint attorneys, "whereby many lands of the persons so described are yet undisposed of, and still continue to beand remain to the use of the same"; that all such lands, not disposed ofbona fide for a valuable consideration actually paid, shall be forfeited to the State. This act then contains an explicit declaration that those who had refused to take the oath and departed still retained their estates, and is equivalent to saying they were not de facto affected by the change of the government. If they did retain their property, they also retained the right of disposing of it, unless forbidden by law. This was only the case with those who remained by permission, after refusing to qualify, and the act passed after 4 July, 1777, namely, November, 1777.
Then, as to the consideration. A citizen of the country, who has committed no crime nor come within the operation of either of the acts, claims title to the lands in virtue of a conveyance, which he alleges passed to him the estate at the time of its execution. The only inquiry then is, Did, the estate then pass? What was there to hinder it? The acts of confiscation, respecting the payment of a consideration, had not then passed. No question about a fraudulent conveyance to defeat creditors is now made. And the father being about to abandon his country, we can readily account for his conveying that he could no longer enjoy himself to his child, whom he was bound to provide for.
If policy, however, is to have any share in determining what (558) kind of contracts were effectual, it would seem, upon the very principles of the right to confiscate, that those for which no valuable consideration was given were most to be favored, inasmuch as they impoverished the subjects of the enemy. But it is far from being believed that the kind of consideration has any sort of influence. The only question must result in this, Was there such conveyance as the law recognized to be valid and to pass the estate? If there was, and the lands then became vested in the defendant, it required an arm more powerful than the Legislature to wrest it from him, without any misdeed. *Page 406 
I am of opinion, therefore, upon every ground I can consider the case, that there should be judgment in favor of defendant, and that, consequently, the rule for a new trial be made absolute. It has, however, been said that the ordinance of the Convention in 1776 prevented these persons from disposing of their estates. That ordinance is confined to persons in the State, so far as it prohibits a conveyance; and as to those out of the State, it is expressly left to the future legislatures to make regulations respecting them.
Cited: Benzein v. Lenoir, 16 N.C. 258.