The bill was filed before 1800, and subsequently amended; from the length of time which has elapsed since the commencement of the suit, many changes have taken place in the parties, which it is unnecessary to notice, as the cause turned solely upon the questions presented by the original and amended bill. It was filed by the plaintiffs, styling themselves "members of the Unitas Fratrum," They (226) averred that on 12 November, 1754, Earl Granville, granted to Henry Cossart, agent of and trustee for the Unitas Fratrum, two tracts of land in Wilkes County; that Henry Cossart died before 4 July, 1776, leaving Christian Frederick Cossart, of the Kingdom of Great Britain, his heir at law; that Christian F. Cossart, with a view to a sale of the said land, in 1772 appointed one Frederick William Marshall his attorney, with a power of substitution; that Frederick W. Marshall, in pursuance of this power, appointed John Michael Graff his substitute, who on 22 July, 1778, sold the said lands to one Hugh Montgomery, now deceased, for $6,250; that Montgomery paid $2,500 of the purchase money, and on the next day, 23 July, for the purpose of securing the balance, demised the lands to Graff for the term of five hundred years, with a proviso for redemption; that Graff, the mortgagee, held the legal title of the term in trust for Unitas Fratrum, and upon his death it vested in Fragott Bagge, his administrator, who, well knowing the trusts upon which his intestate held the same, assigned it to Frederick William Marshall, the agent of and trustee for the Unitas Fratrum, who by his will, dated December, 1801, devised it to the plaintiff Benzein, who was also one of his executors, by whom the will was proved in this State; that in all the above recited transactions Henry Cossart, Christian F. Cossart, Frederick W. Marshall, and John M. Graff admitted themselves to be trustees for the Unitas Fratrum, an ancient Episcopal Church, recognized as such by an act of Parliament, 22 Geo. II., and that the name of Henry Cossart was used for no other reason but because the legal title to the land was supposed to be vested in him, and that Montgomery in his will recognized the balance of the purchase money for the said land as a debt due by him to the Unitas Fratrum, and charged his residuary estate with the payment of it; that (227) Montgomery in his lifetime conveyed the said lands to several persons, of whom John Brown was the only survivor, in trust for his two infant children; that he appointed the same persons executors of *Page 128 
his will, and that he in his lifetime, and his executors and trustees since his death, had held possession of a part of the said land. The bill then averred that the defendant Lenoir, and other persons claiming under him, who were also defendants, pretending that the land was subject to entry, had obtained grants for part of it.
The plaintiffs insisted that the grants, if any had been obtained, issued since 1777, and were not warranted by any law for opening the land office; that if the land had been entered as confiscated, the grants were void and inoperative, and if they were not void, that the State held the land if it had been confiscated, as a trust to secure the debt due to theUnitas Fratrum, and that it was still subject to this trust in the hands of the defendants, who they averred had notice of it at the time they obtained their grants. The plaintiffs denied that the land was within the several confiscation acts, and in support of this position relied upon the act of 1782, entitled "An act to vest in Frederick William Marshall, Esq., of Salem, in Surry County, the lands of the Unitas Fratrum in this State, for the use of the said Unitas Fratrum and other purposes." The bill also alleged that there were defects in some of the instruments of transfer from Cossart to Montgomery, and sought to have the same corrected.
The executors and trustees under Montgomery's will, as well as the persons who claimed under grants from the State, were made defendants. The plaintiffs prayed a discovery of the title claimed by the defendants who were grantees, and that they might be decreed to be trustees for the infant children of Montgomery, and compelled to convey their titles and deliver up possession to his surviving trustee, and that the (228) plaintiffs might have satisfaction of the debt due to the Unitas Fratrum.
John Brown, the surviving executor and trustee of Montgomery, in his answer admitted all the allegations of the bill; stated that he had brought an action at law to recover possession of the land, in which he failed. He denied his obligation to pay interest on the mortgage debt, because he had never been put in possession, and submitted to pay the balance whenever this was done.
The defendant Lenoir, in his answer, admitted that he had on 22 May, 1779, 24 September of the same year, and on 1 March, 1780, obtained four grants for land which was within the boundaries of the land mentioned in the bill; that these grants were founded on several occupancies, some of them as old as 1765. He averred that he had been in actual possession and occupation of all the lands included within his grants ever since their date, claiming the same adversely to the title of any person whatsoever; and prayed the benefit of the act of 1715, entitled *Page 129 
"An act concerning old titles of land, and for limitation of action, and for avoiding suits in law." He denied that Henry Cossart held the land mentioned in the bill in trust for the Unitas Fratrum, and insisted that he held it for himself. He denied having any notice, before the date of his grants, of the title of Cossart, or of the trust claimed by the plaintiffs to exist for the Unitas Fratrum, but admitted that before that time "he had heard that the Moravians set up some claim to two tracts of land, which were supposed to include the four several tracts herein mentioned as claimed by him, but it was nothing more than a vague report, often contradicted by persons who said they had asked the Moravians about it, and that they disclaimed having any title to them, but that he never had any information in the premises to induce him to believe that the Unitas Fratrum had any just claims to the land mentioned in (229) the bill."
There were twenty other defendants. The titles of those who did not disclaim were in all important particulars similar to that of Lenoir. The grants they had obtained were all dated since 1754, and they admitted the same notice, and relied upon the same defense.
The deeds of Lord Granville to Henry Cossart, the power from Christian F. Cossart to Frederick W. Marshall, the deed of substitution from Marshall to Graff, the conveyance by Graff to Montgomery, and the mortgage made by the latter, the assignment by Bagge to Marshall, as well as his will and that of Montgomery, and a great variety of other documents, were filed as exhibits to the bill. An abstract of those above mentioned only is thought to be material.
The deeds of the Earl of Granville to Henry Cossart, dated 12 November, 1754, were indentures "made between the Right Honorable John Earl of Granville, etc., and Henry Cossart de St. Aubin, agent of the UnitasFratrum." The limitation was "to the said Henry Cossart, his heirs and assigns forever." The covenants for the payment of the quit-rents were that "The said Henry Cossart de St. Aubin, his heirs and assigns, shall," etc. There was no declaration of trust for the Unitas Fratrum, neither was their name mentioned in the deeds, except in the manner above set forth. The return of the surveys, however, stated them to have been made "for the Lord Advocate, the Chancellor and agent of the Unitas Fratrum." The power of attorney from Christian F. Cossart to Frederick W. Marshall recited that "for the end, intent, and purpose that all and singular the fee simple, inheritance, and full property of all my messuages, plantations, and hereditaments now belonging to me, the said C. F. Cossart, situate, lying, and being in the Province of North Carolina, may be sold, etc., the said F. W. *Page 130 
(230) Marshall, of Salem, in Wacovia (the name of the Moravian settlement), in the said Province of North Carolina," was authorized to sell and dispose of the same, and he was directed "to remit and consign the proceeds to me, the said C. F. Cossart, or otherwise to my executors, administrators or assigns." No mention whatever was made in it of the Unitas Fratrum.
The substitution of Graff for Marshall followed the words of the original power, and in no way upon its face did it appear that Graff was the agent or trustee of the Unitas Fratrum, whose name was not inserted in the deed. The same was the case with respect to the deed made under this power by Graff to Montgomery, and of the reconveyance to Graff in mortgage, and the articles in execution of which the deed was delivered recited that the land was the property of C. F. Cossart.
The assignment by Bragge to Marshall recited the power from C. F. Cossart to Marshall, the substitution of Graff, the sale to Montgomery, and the mortgage by the latter to Graff, but contained no allusion to the interest of the Unitas Fratrum.
F. W. Marshall, by his will, recited that "Whereas it is incumbent on me to see that sacred trust imposed in me by the people known by the name of the Unitas Fratrum, with respect to all the land which I have and hold for them in the State of North Carolina, settled and established," etc. The will then recited the conveyance by Earl Granville, on 7 August, 1753, of 98,985 acres of land, known as Wacovia, to James Hutton, secretary of the Unitas Fratrum, and a declaration of the same date by Hutton that he held the whole of the 98,985 acres of land in trust for the use and benefit of the Unitas Fratrum, and declared the trusts upon which great quantities of land in Pennsylvania and New Jersey, as well as in North Carolina, were held, and devised the whole thereof to the plaintiff Benzein in fee simple, in trust that the (231) devisee and his heirs "would maintain the said United Brethren in possession of the said tracts and parcels of land." And as to the lands in dispute, the will declared that they were originally "conveyed by the late Earl Granville to Henry Cossart, agent of the Unitas Fratrum, in trust for the same. The legal estate was afterward by virtue of a power of attorney conveyed by me, or which is the same, by my attorney, John M. Graff, to Hugh Montgomery. And whereas the said Hugh Montgomery did mortgage the same lands to said John M. Graff for the balance of purchase money, and Fragott Bagge, administrator of the said John M. Graff, assigned the said mortgage to me, I do therefore hereby devise all my right, etc., in and to the said lands to the said Christian L. Benzein, his heirs and assigns, in trust, as aforesaid." *Page 131 
Montgomery, by his will, which was proved in 1780, after several specific bequests, charged all the remainder of his estate with the payment of his debts, and "especially with a just debt in specie, which I owe to the Moravians at Salem, and I do in a particular manner order and direct my said executors to satisfy and discharge such Moravian debt, in gold or silver, according to equity and good conscience, and for that purpose to sell and dispose of so much of my said residuary estate for gold or silver as shall fully satisfy that debt."
Replications were taken to the several answers, but the plaintiffs, by an instrument filed as an exhibit, admitted that the defendants had been in possession of the land claimed by them in the manner set forth in their answers.
The depositions filed were exceedingly voluminous. It is thought, however, that the case may be easily understood without an abstract of them.
A decree for the plaintiffs was made in 1814 (4 N.C. 117), and the object of the petition was to reverse that decree.
I shall place this cause upon a single point — the defense set up under the statute of limitations, which depends upon the right of the defendants to use in this Court their grants from the State as color of title. I consider it entirely unimportant to either party whether the lands were granted to Cossart in trust for the Unitas Fratrum, and, if so, whether the trust was valid; for if both propositions were decided in the affirmative, if Cossart has lost his estate, the cestuique trusts have lost theirs, also. Their interest, being a mere shadow of the legal estate, vanishes when that ceases to exist — that is, when a different one arises, or, in the language of the law, where (258) another comes in the post to an estate in the lands. I do not mean where the estate to which the trusts were annexed falls into other hands than those appointed by the creator of the trust to take it; as where the devisee in trust dies before the devisor, there the heir takes the estate subject to the trust. The law is the same as to tenants by the curtesy, tenant in dower, and the bargainee under a bargain and sale, who are said not to come in by the trustee, but by the law, their estates being the same with that of the trustee, and cast upon them by law, although not created by the act of the party. Nothing but the technical expression, the per and the post, and not going beyond the letter of the maxim into the principle upon which it is founded, can for a moment *Page 132 
sustain the idea that those estates were detached from the trusts. But the lord who comes in by escheat above his tenant's estate, the abator, the intruder, the disseizor, who thereby acquire a new estate, are not affected by the trust; and if as against them the trustee loses the legal estate, the trusts immediately vanish, as the shadow disappears when the substance is gone. The trusts remain dormant until the legal estate is regained by the trustee, when they immediately spring up again. The plaintiffs, or, more properly, those who claim Cossart's estate, cannot attach a trust upon the estate of the defendants, through the medium of the State, upon the idea that she, upon the alienage of Cossart, succeeded to his estate, subject to the Moravian trust, if any existed; and that the lands were then granted, subject to the same trusts; for in reality Cossart's estate did not come to the State at all, neither by the Revolution nor by the confiscation acts, according to the principles adopted in Campbell v. McArthur, 4 N.C. 552.
(259) The plaintiffs' equity is to have the grants of the defendant surrendered up, as fraudulently obtained, both as against the State and against them. It is shown that long before 4 July, 1776, the lands in question were granted by Lord Granville, the then proprietor, to Cossart, and that the defendants, with a knowledge of that fact (for rumor, in this Court, is knowledge), entered and obtained grants for them from the State, under our entry laws, as vacant and unappropriated lands, in violation of both the letter and the spirit of those laws. I say that rumor is knowledge in this Court, if the rumor turns out to be correct, for although in this case, as the defendants say, there was but a report — a mere rumor — that the Moravians claimed these lands, which some pretended to believe, but more disbelieved, this rumor was notice; it should have put them upon inquiry. And if the rumor turned out to be correct, and the lands had been granted (whether to the Moravians or to others, it is unimportant, for the fact of their having been granted, and not the names of the grantees, rendered the conduct of the defendants fraudulent), they must take the consequences. They cannot say that they were innocent purchasers, who had paid their money. They took upon themselves to determine as to the truth of the report. The report turns out to be true. Equity requires that they should abandon their designs; and their persisting in them, after the rumor was ascertained to be founded in fact, is conclusive that had they thought their design would have succeeded, they would have made the attempt with a perfect knowledge of the fact. In fine, it was a game of hazard; they adventured, and have lost. The report turns out to be true; the lands have been granted, and they must take the consequences. But the defendants say they were not granted to the Moravians, nor to *Page 133 
any one in trust for them; that Cossart held to his own use and benefit; that if their design was fraudulent, it was against the Moravians, and not against Cossart. It is no defense either in the civil or criminal code that the blow was not designed to injure the persons (260) stricken, but another; neither is it in this Court. The defendants stand, therefore, before this Court as having obtained their grants upon suggestions which were not only untrue, but which they knew to be untrue. They ask to be permitted to retain them. Upon what principle shall this be permitted? For what purpose? They tell us now to connect them with a seven years possession, and thereby bar the recovery of the plaintiffs under that very title of which they had notice when they obtained their grants, and to defeat which, by some indirect means, was their original object. If compelled to give evidence against themselves, this must be their answer; for without foreign aid, their deeds were worthless. The lands had been previously granted. The grantor had nothing in them. Besides, they were obtained from a grantor to whom a fraud cannot be imputed, and if in dealings with such a grantor, any exist, the consequences must be borne by the grantee. It appears to me that to refuse our interference would be to reward iniquity, not to redress a wrong.
It is to be observed that the State, ex mero motu, or at the instance of the party aggrieved, would have caused these grants to be surrendered up to be canceled. When this bill was filed, a court of equity, by the well-settled decisions of our Court, was the proper place to apply for redress against a fraudulent grant. HAYWOOD, J., it is true, for some time struggled against this practice, contending that the proper redress was at law; but he ultimately yielded.
If Earl Granville had granted, or rather passed, to Cossart an equitable title, and the lands had come to the State subject to the equity, and the State had made the grants to the defendants with notice, as in this case, can there be a doubt but that this Court would have made the defendants trustees for the plaintiffs? And where is the difference? In reality there is none; it lies only in a name. In the (261) one case they have the legal title; in the other, the equitable. In the first case, they come into a court of equity, not for the legal title, but to protect it, to guard it from harm and injury, as if the boundaries are obscure, or the landmarks wearing out — equity will relieve by establishing them, and that upon the bill of one having the legal title. So, also, if a fraudulent deed has been obtained from the grantor, or from a stranger, and there is a probability of annoyance to him having the legal title, equity will relieve by compelling a surrender of the fraudulent deed — equity will remove everything that improperly clouds or obscures *Page 134 
a legal title, one great object of the Court being to give repose, to quiet and remove all fears and apprehensions arising from the fraud or iniquity of others, with regard to property. All that is required to be shown is that the fears are not idle or imaginary, and that there is a probability of harm.
Had this bill been filed, calling for a surrender of these grants after the facts in relation to them had been established, and soon after they were issued, the only possible defense which could then have been set up would have been that the plaintiffs' apprehensions were groundless, and that the grants were perfectly harmless; for the plaintiffs' being the elder and of course the better title, could not be affected by them. To this it might then be properly answered, as the event in this case has shown to be true, although the deeds are fraudulent and void, yet they may be used to our annoyance. In the first place, they cloud our title, and may injure us should we wish to sell. But worst of all, you may connect them with a seven years possession, and bar our estate. You may also, under cover of them, perplex us with a lawsuit for almost half a century. These are certainly not such idle fears or imaginary injuries as would induce the Court to dismiss the bill because the plaintiff (262) had not made out a case of impending harm. If these anticipated injuries would be a sufficient reason for sustaining the bill, if filed immediately after the grants were obtained, a fortiori the reality is now sufficient ground for affording relief. The lapse of eight or ten years after our courts were opened before filing this bill forms no defense, and more especially when in that short space of time an attempt was made to obtain redress at law, and which failed, probably from the temper of the times, for I imagine that no title derived from Cossart would then have been recognized. I feel, therefore, satisfied that this Court is bound to take from the defendants their grants, and all benefits derived from them; that they should be detached from the possession. In my mind, the possession set up under them by the defendants tends to weaken their case, as to retaining the grants. It shows in glaring colors the impropriety of permitting them to be retained, and settles the question as to the right of this Court to interfere.
I have used throughout this opinion the terms fraudulent, iniquitous, etc. I apply them in their legal sense only, not by any means intending to impute corruption or fraud in its ordinary acceptation to the defendants; I use them for want of some milder terms.
I feel some difficulty in affirming the decree on account of the place in which Montgomery's devisees stand before the Court. They unquestionably should have been plaintiffs instead of defendants; and it is difficult to conceive why they were not originally made plaintiffs. It *Page 135 
can be accounted for only from the ignorance of our equity practitioners. But they are before the Court; consequently their interest is bound. Their rights were as fully contested by the other defendants as if they were plaintiffs. I cannot perceive that any prejudice has arisen to any one of the parties on that account. I repeat again, that this Court does not take from the defendants the benefit of their grants because the land had been before granted, but because, in addition thereto, (263) they knew that they had been granted. Their object was to deceive or defraud some one, if not at first, most certainly when they learned that the lands had been granted. They then well knew that all they acquired by their grants was taken fraudulently from some other person; and they cannot rightfully gain anything by them if they are in fraud of the rights of others.